Thank you, Your Honors, and may it please the Court, Ken Halpern of Stress and Maher for the Plaintiffs and Appellants, The Depot, et al. The question this case presents is whether an insurer that defrauds ERISA plans can be held liable for its fraud under any theory. CFM and HCSC, I'm going to refer to them both as CFM for convenience, try to frame this as a mine-run insurance case with dangerous implications for the whole industry if CFM is held to account. But this case began only after the Montana Insurance Commissioner did an investigation and found CFM had hidden illegal surcharges in its bills over a period of years and fined it $250,000. CFM did not challenge those findings. It did not say to the State of Montana, this is perfectly normal conduct by an insurer, what are you doing? It paid the fine. And yet now it tells this Court that holding it liable for the money it stole would endanger the whole industry. CFM is trying to hide behind normal insurers who don't break the law and don't impose illegal surcharges while fraudulently labeling them as premium payments. And under each theory of liability, the fraudulent nature of its conduct not only illustrates why plaintiffs may recover, it cabins liability so that normal market behavior is not opened to suit. Plaintiffs are entitled to recover under any of four theories. First, CFM's knowing participation in a prohibited transaction as a party in interest, which requires it to disgorge its gains. That one is straightforward. Harris Trust recognized that there is an equitable claim to recover the proceeds from a third party that knowingly participates in a prohibited transaction. There is monetary relief, and the equity treatises that Harris cites make clear that monetary relief was exclusively available in equity and therefore is equitable in nature. Second, CFM's control over plan assets made it a fiduciary. Its power to unilaterally reduce the amount of benefits during the term of the insurance contract meant benefits were not guaranteed and, therefore, the exemption does not apply, and so the member dues were plan assets. Third, its discretionary authority over the plan made it a fiduciary. When exercising that authority, which it exercised to add surcharges during the plan term, using its unilateral power to do that, and although it actually didn't give notice, so it did not conform to that term, and also it failed to bring the surcharges in line with its promise to charge only the medical premium. And, finally, the state tort claims. Okay. Let me just walk through these just a little bit. So the first one is a claim in equity, okay? It's not brought under ERISA, is that correct? It is brought under ERISA. It is brought under ERISA. Yes, under Section 502A3. Okay. Second claim is also brought under ERISA? Yes. Third claim brought under ERISA? Yes. Fourth claim is state claims? Correct. Okay. Can you win on all of them simultaneously, or do you have to sort of choose either or between either ERISA or the state claims? Because it seems to me that ERISA has some pretty powerful preclusion statutes, so that if you think you've got a viable ERISA claim, then you probably don't have the state claims. On the other hand, if for some reason it's not precluded, then you may have the state claims but without the ERISA claims. Now, can you hold two thoughts in your head at one time, that is that you get both the ERISA claims and notwithstanding the preclusion claims, you still have state claims? I think we would still have state claims because the reason that the state claims are not preempted is that they don't arise from a duty created by ERISA. They arise from a sort of an ordinary duty not to commit fraud. Well, if that's true, then why do you have ERISA claims? Because these are addressing different aspects of the conduct. But the preemption under ERISA is pretty broad. It's related, sort of. I mean, that's the word, is related, not arise under. Right. So if this is an ERISA claim, I'm not sure you've got any state claims when they really come out of the same conduct. Yeah. I mean, I think the same conduct, though, can trigger liability under completely independent theories. Right. I mean, I think the more different… I understand that, too, but I'm looking at sort of the wording scope understanding of the ERISA preemption, which is pretty broad. Well, Your Honor, I will say this. If the Court should find that the dismissal of the ERISA theories was incorrect and reverse, we would be… You'd probably be happy. Yeah, we'd be very happy to proceed under those theories. I mean, I think what I would say about preemption is, you know, the Paulson case says an ERISA relationship is not involved where a plan operates like any other commercial entity. And, right, so first there's the question of duty. Is the claim based on a duty distinct from ERISA? And we would argue that the ordinary commercial duty not to commit fraud is distinct from ERISA. And then the second is, does it regulate an ERISA relationship, which really isn't just about who the parties are, but also the capacity in which they're relating to each other. Is that part of what ERISA regulates? Would this interfere with plan administration? And, again, we would say, you know, there's a language, I believe, in Paulson, a case from this circuit that says an ERISA relationship is not involved where a plan operates like any other commercial entity. However, if your honors should find that the fraud claim, the fraud aspect of the claim inescapably is intertwined with the excessive compensation ERISA claim for a prohibited transaction that arises from the same conduct, then there would be preemption. But the premise of the first two claims is a breach of fiduciary duty, right? Yes. You claim that they're fiduciary. And I'm having trouble understanding how fraud is distinct from, on the facts of this case, how your theory of fraud is distinct from the breach of fiduciary duty, you claim. It seems like they arise out of the same actions. Well, the fiduciary duty requires the fiduciary to act, excuse me, primarily in the interest of, right, to maximize the interest. You can violate that duty without committing fraud. Yes, but that's not your theory on the breach of fiduciary duty, is it? You say, look, there are these undisclosed, you know, supplemental charges, which sounds in the nature of fraud to me. They didn't tell us they packed these things in. It was deliberate. So that's where I'm having some difficulty understanding the distinction between the state claim, where you say predicated on fraud and different facts, and the breach of fiduciary duty claims. Yeah, it's definitely predicated on the same facts. I would say it's different theories on the same facts. So does that mean you're precluded on the state claim in light of the preemption under ERISA? Well, I would argue no because the ERISA preemption standard looks to whether this arises from a duty, right, whether the claim arises from a duty created by ERISA. And the duty not to commit fraud is a distinct duty from the duty to manage the plan for the benefit of participants. If I may move on to the prohibited transaction claim, Your Honors, if you're happy to answer further questions on that. Okay. So there are two issues, whether the claim is equitable and then whether the remedy is equitable. As for the claim, this is actually a point CFM did not raise below, and so they have waived it. But the Supreme Court recognized in Harris Trust that a counterparty can be sued under Section 50283 for knowing participation in a prohibited transaction because, in part, one of the reasons was that the counterpart of that claim in historic trust law was a third party's knowing receipt of trust property from the trustee in breach of trust. So that seems absolutely clear and straightforward from Harris Trust. And as for the remedy, Harris Trust resolved that issue as well. It recognized two distinct remedies, one for restitution of the property if not already, I'm quoting now from page 250, for restitution of the property if the property has not already been disposed of, or disgorgement of proceeds if already disposed of, as well as the third party's profit. CFM seems to argue that if already disgorgement of proceeds, if already disposed of, which seems clearly to reference a situation where the property was dissipated, that somehow that requires tracing. There's no mention of tracing in Harris Trust. The property at issue in Harris Trust was money. So if it was disposed of, then it's been dissipated. And most importantly, Harris Trust refers to this dichotomy of two remedies, restitution if not disposed of, disgorgement if proceeds disposed of. And it cites all of the same treatises that are cited in Mertens and that whole line of cases as informing the court what were historically equitable remedies. And the treatises have a dichotomy as well. And the dichotomy is the property if it can be traced and the value if it can't be traced. So, for example, in the Scott and Fratcher treatise, the transferee can be charged for the amount of the proceeds or the value of the property. Bogert, tracing as to all property identified and a money judgment as to the balance. So these are what the authoritative treatises are describing as equitable monetary remedies. And this is not unprecedented. Cigna v. Amaro recognized the remedy of surcharge against the trustee as an equitable monetary remedy and noted that because it was exclusively available in equity, it was originally equitable in nature or typically equitable. And similarly here, the Scott and Fratcher treatise says that this recovery against a third party for knowingly receiving trust property and breach of trust was exclusively available in equity. I should also note that in the Landwehr v. Dupree case, a 1995 case in this court, the court found restitutionary monetary relief was available against a third party who received money in a prohibited transaction, noted that such liability was specifically recognized in Mertens. There, the third party was a chauffeur who had been paid massive amounts in a kind of very generous tipping by the trustee out of the pension fund. That chauffeur had no idea where the money came, didn't understand where the money came from, and he was clearly not himself a fiduciary. The money didn't remain planned assets, but nonetheless, it was recoverable. CFM argues that Great West limits the meaning of Harris Trust somehow. Great West was not a prohibited transactions case. Its comments were dicta. But actually, what Great West said essentially quotes Harris Trust and then says, well, the relief in that case was equitable restitution, but it said something very helpful to explain what it meant, which was not to limit it to tracing. It said, it is doubtful that restitution pertains to the substance of the relief rather than to the legal theory under which it was awarded. In other words, whether it's money or an injunction or some other substance, in the view of Great West, turns on the theory under which the relief is awarded and whether that theory was traditionally equitable. And here the treatises very clearly say that it was. And finally, regarding the parade of horribles warning that CFM has mentioned, which is, you know, this will deter insurers, service providers from contracting with ERISA plans, the Harris Trust court considered exactly that concern and they said, well, the way to deal with this is that it should inform courts' determinations of what a transferee should be expected to know when engaging in a potentially prohibited transaction, providing services to an ERISA plan. That could involve difficult line drawing because, you know, the concern was, well, are service providers going to have to monitor ERISA compliance carefully to make sure they don't get caught? But here it was the third party service provider, the insurer, that contrived the entire scheme. So there's no question that they had knowledge of the breach. And so there's not really a difficult line drawing problem. You can find monetary remedies available against CFM without creating a problem for the innocent service provider that doesn't know that it is involved in a breach. So I'd like to reserve my remaining time, Your Honors. Thank you. Good morning, and may it please the Court. I'm Anthony Shelley here on behalf of the Appley Caring for Montanans. With me is Mr. Stanley Kalisic. He's here on behalf of Healthcare Service Corporation, the other Appley, and together we have our 15 minutes, and I'd like to use 12 and reserve three for Mr. Kalisic. We'll try to keep track of it with you, but it's your job to keep track. Thank you, Your Honor. I'd like to approach this by first addressing some points that Mr. Halpern made on the specific claims and then address some of the bigger themes in the case that show why the district court got everything correct here. First of all, I'll start with preemption. The Court is correct that if the grievance falls under an ERISA claim, whether there's a remedy or not under the ERISA claim, then there is no ability to sue under state law because of ERISA preemption. And what if I were to conclude, and I certainly am not speaking for my colleagues on the bench, what if I were to conclude there is no ERISA claim here? Well, it depends on how. Then what happens to the state claims? Well, Your Honor, it depends on how you would conclude that there is no ERISA claim. If you were to say there's an ERISA claim but there's no remedy, then there's no state law claim that can then fill in the gap. Yeah, I didn't say that. I said what if there is no ERISA claim? If there's no ERISA claim and ERISA doesn't address this, then state law potentially would be available. There are situations where there's no remedy anywhere, where Congress intended no remedy, but typically if ERISA doesn't apply. Could you make the preemption argument as to assuming there is no ERISA claim, could you tell me why a state claim is preempted by ERISA? Because I'm inclined to think it's not preempted. Well, I will say that if ERISA doesn't enter the area, if this is not covered by ERISA, I will agree that there would be a state law claim. But here ERISA does cover this, and the Court's decision in Rutledge expressly answers this question, which we cited in our brief. Where a service provider, here an insurance company, is asserted to have charged too much for its services, and that's the basic allegation in this case, then ERISA provides the party and interest remedy that they've sought as well, so long as there's a remedy under it. And Rutledge held that that's the remedy you have to use. You have to use ERISA's party and interest remedy, fiduciary suing a party and interest. And Rutledge held there's no relief available under that remedy, under ERISA, so the ERISA claim was not viable, but then held that you can't alternatively sue under state law. You know, ERISA is a peculiar statute, and I've been dealing with its peculiarities for almost 20 years now. But it would be really peculiar if your client had behaved in fraudulent behavior. That's if I'm not, okay, I'm not saying your client did, although there may be some reasons to suspect your client did. But if your client behaved in fraudulent behavior, that the federal statute doesn't protect those who have been defrauded, and at the same time the federal statute disables state law from protecting those same people. That's a really weird statute, maybe even weirder than ERISA is. Well, ERISA is a balancing statute. It balances the employer's ‑‑ it balances the participants in beneficiaries' remedies versus the desire to get employers to create ERISA plans. And so the Supreme Court has often talked about the difficulty of balancing those, but it comes out in the remedies. Here, though, the Court doesn't need to worry that there would be no remedy at all. The Insurance Commissioner, first of all, had investigated this, and frankly it was a minor violation in an audit that the Insurance Commissioner did. The amount of the fine was minor compared to the billions of dollars that change hands in claims under the programs here. And ultimately it wasn't challenged because it would be more expensive to challenge it. But in any event, this is ‑‑ the judge didn't want to make a federal mountain out of what I think he suspected was a molehill. But there are other ways to address the concern, if there is a concern. An active fiduciary, for instance, could have asked the questions of, they knew exactly what we were charging here and could have said, what is that made up of here? And the questions were never asked. Ultimately, when the Insurance Commissioner looked at it, the Insurance Commissioner asked exactly those things. So an active fiduciary could have solved this problem before it occurred. There's also the remedy of ‑‑ the way ERISA works, the remedy here is you have to follow the money. They asserted that the money was spent immediately on kickbacks and new benefits, and as a result, the remedy is to go after the recipients of those, actually. And so while it may sound bizarre because that's the way Justice Ginsburg described it in her dissent recently in the Montanil case, what ERISA requires is that you have to sue a party that holds the money. And here they alleged right off the bat that the money was given to somebody else, not that Caring for Montanans ever benefited from it, but someone else was received kickbacks for this. So Judge Fletcher, I don't think it's a situation where ERISA would not provide a remedy. It's just not a remedy against us in this particular situation. One of the points that Mr. Halpern made was that we didn't raise this argument of challenging the type of remedy under the party and interest claim. In reality, the district judge answered the situation the way it was presented by Mr. Halpern's client, and that is they said there's no need to trace this money because somehow disgorgement is different from every other type of equitable remedy, and you don't have to look for a segregated fund in order to gain relief in the situation. Up here on appeal, they make totally different arguments, and those arguments are that, in fact, you can trace the money. If it's commingled in a general account, the money still remains there. So this idea of commingling comes up, and it takes up a good part of the brief here on both sides. But that was never pursued below, and so to attack us as having not raised an argument in response to something they never raised below will take some boldness. But the reality is that all of this can be dealt with with that argument that we raised, which is that the nature under the party and interest claim, the equity claim under 502A3, the basis of the claim has to be equitable. They have to have an equitable cause of action. And here, equity would allow money relief only if you had a fiduciary, a bankrupt person, a lien by agreement, or you had money that you weren't seeking from the original party who received it but from another party who sent it on to that party. Those are the only exceptions. Otherwise, money was in the courts of law, not in the equity courts. The court doesn't have to get into any of this equitable treatise material about commingling or general accounts or even segregated accounts because they don't have the nature and basis of their claim is not equitable to start with. On the fiduciary claim, I'd like to make just one point, and that is they assert that we had this unilateral, unique right to change the terms of the insurance agreements, and the district court rejected that. The district court looked at the entire contract that was presented in the materials that was incorporated into their amended complaint and held that, no, it wasn't a unique situation. Federal law allows changes to insurance contracts upon 60 days' notice. So does Montana law. That's exactly what this provision that they cite as somehow unilateral and unique created, that kind of situation. What the argument in the briefing seems to be is that they didn't really have the notice provision was really unilateral because they didn't really have the right to terminate during the notice period. But the district judge didn't agree with that argument. And also, if you look at the excerpts of record on page 69, it specifically says that the contract only exists as long and until the employer pays dues. So with notice of the changes, supposedly unilateral, came the right to walk on their part. And Santameno, another one of this court's cases, specifically says that there's no discretion making one a fiduciary based on a notice provision of a change that then the other party can accept or reject. So the fiduciary claim fails on this discretionary theory. And then on the sort of some of the bigger themes in this case, it's a case searching for an injury, in a way, because the contract price was agreed to at arm's length. At page 27 of their brief, they agree the initial contract was at arm's length and the price was at arm's length, yet they want to, and so what they're really complaining about is what supposedly was done with the money after it was received by us. But the Hannon case from the Second Circuit, for instance, says you've got, if it's agreed to by the parties at its arm's length, that would suggest then that it's sort of pre-ERISA before ERISA kicks in, but that would then suggest that they might have state claims. Well, no, because the claim is still that it was too much. In other words, to have any injury at all, it would have to be that somehow. Yeah, but you could have some kind of a fraud and inducement or something. That they had misled them about what the premium encompassed. This is the same issue, though, that came up in Rutledge, in this Court's Rutledge case where there were fraud claims or misrepresentation claims about the price charged by a service provider, and the Court said that is a claim for a fiduciary to bring against a party in interest for unreasonable compensation as a prohibited transaction. Let me pursue, Judge, Bybee's line of questioning, and then the answer that you've so far given. His question suggests that, well, if the objection is to the amount charged initially, that really suggests that it's pre-ERISA because that's the contract that gets you into ERISA, and the question is the original price charge. And then your answer was somehow that that would not be a good claim, but, well, I think that's yet to be determined. I mean, he wants to bring those state claims, and they haven't been litigated. And they may or may not be good claims. Rutledge and ERISA, Rutledge being this Court's case, ERISA say that if the person, the third party, the party in interest, causes the fiduciary to enter a contract for unreasonable compensation, that's an ERISA claim that you have to sue, and you have to then sue the right party. Are you conceding fiduciary status, then? No, they're the fiduciary. So the only thing I'm conceding is that we're a party in interest. So the fiduciary plaintiff sues the party in interest for having caused them to enter a contract at unreasonable compensation and seeks the return, the unreasonable amount, from us. But they can only get it if it's appropriate equitable relief, and it's not if the money's already been spent or they're not suing the party holding the money. So ERISA is complicated in the way it does this, but Rutledge really goes through this. And it's a lengthy opinion where the Court talks about, and I'm sorry there's no remedy in this situation because ultimately the money wasn't kept in a segregated fund, but that's the way it is under ERISA. You have to go find the party who has the money. So we think the District Court got things right on the fiduciary claim, the party in interest claim, and the state law claim, and we would ask to affirm it. I cede the remainder of my time to Mr. Kellison. Thank you. Good morning, Your Honor. May it please the Court, my name is Stan Kalisic. I represent Healthcare Service Corporation, which I'll refer to as HCSC for convenience. Now, the depot plaintiffs failed to comply with Rule 9b in their pleading in that they failed to plead with specificity the who, when, where, and how to support their allegations of constructive fraud and fraudulent inducement, which they allege in their first amended complaint occurred both before the plaintiffs entered into their contracts and also through the renewals of those contracts. Now, in failing to plead with specificity, both CFM and HCSC are left to guess who made the representations, what the representations were, when they were made, or how they were made. And this is addressed to the state law claims, correct? And this is addressed to the state law claims, Your Honor. So what happens if we were to conclude that the district judge got it right with respect to the ERISA claims but got it wrong with respect to the preemption of the state law claims? Does the district judge necessarily keep the state law claims? Can he dismiss them without prejudice? I mean, they're in there under 1367, and I think he doesn't have to keep them. That's correct, Your Honor. He does not have to keep the pendent state claims. And so what happens if he concludes that you may be right that Rule 9 in the federal court is not complied with, but he says, but, you know, I don't want them anyway. I gather the Nevada version, excuse me, the Montana version of Rule 9 is not quite so demanding of the plaintiffs.  Well, I guess we'd find out if the district judge decides he doesn't want to hear them and sends them away to be refiled in state court. We cite it in our brief to this court, Your Honor, the Town of Geraldine case, which is a 2008 decision of the Montana Supreme Court that also says that you need to plead fraud and the inducement with specificity. So it parallels both in content and in interpretation of the federal rule. Was this case removed to federal court? This case was not removed to federal court, Your Honor. So if the district court didn't want the claims, does he just dismiss the case? And then the plaintiffs can refile in state court if they wish? Assuming that the court finds that the federal claims are preempted. That's the assumption. That's the assumption we just have. If only the state claims survive, and as the statute of limitations run? Your Honor, I think that's an issue that would have to be litigated specifically, and we've not raised that because we've not yet answered the complaint. And I understand. I mean, I think it's also not an unusual practice for a district court to condition the dismissal of that on the defendant waiving any objections to the statute of limitations. And I don't know whether in this particular case the court would do that. The fact is, Your Honor, that while the plaintiffs claim that it was not until 2014 that they understood that this alleged wrongful conduct occurred, factually that's not the case. In paragraph 36 of their first amended complaint, they acknowledge that in 2012 CFM provided itemized billing, indicating what each of the components of the payment were. The fiduciaries, the plaintiffs in this case, received those itemized bills in 2012. They received them in 2013 from CFM. On July 31st... Did the bills indicate that there was a kickback going to the Chamber of Commerce? The bills indicated that there was a payment to the Montana Chamber of Commerce. I don't know that I would agree the characterization that it was a kickback. The arrangement was no different than an arrangement with which we're probably all familiar from commercials and magazines and on television, where AARP sponsors various insurance programs. The Montana Chamber of Commerce was doing the same thing in this case. But it wasn't until after July 31st, 2013, that my client, HCSC, even came on the scene. When it did come on the scene, it had an asset purchase of the ongoing insurance business of CFM. It did not assume the liabilities of CFM. It did continue providing itemized bills. And nowhere in the complaint do the plaintiffs allege that they ever approached CFM or that they ever approached HCSC and asked what were these itemized payments for, objected to the itemized payments, nor did they at any time fail to continue to make the monthly payments through the terms of the insurance contracts that were at issue. Okay. Thank you. So on that, I'm sorry, Your Honor. Well, you've used your three minutes plus. So if you'd like to sum up, I won't cut you off. Oh, I'm sorry. I didn't realize I had used my three minutes. No, that's okay. If you'd like to sum up, I don't want to cut you off. I would just say in summary, for the reasons that my co-counsel stated, there is a risk of preemption. Even if there is not a risk of preemption, there's a failure to meet the requirements of Rule 9b. The district court got it right, and you should affirm the district court. Thank you. Thank you. Thank you. Thank you, Your Honors. So CFM and HCSC's theory seems to be that they were entitled to do this because they did not get caught. I just want to address a few factual points first. They say, well, we could have stopped it when it was occurring. No, our clients could not have because the charges were hidden. It is not true that there was a bill indicating that a payment was being made to the Chamber of Commerce. The allegations are very clear that these charges were disguised as premiums for years, and then eventually on the advice of their lawyers, they started putting other cryptic notations that still didn't say what was going on. Second, the idea that this was a peccadillo, that is not true. This was the largest fine levied by the insurance commissioner in the history of Montana. What was the amount of the fine? $250,000. And the total liability is in the single-digit millions. So the fine was a significant percentage of that. Third, it is not true that the allegations are limited to, you know, that basically the allegations are that the charges were as agreed. There is specifically an allegation in paragraph 53 of the complaint that the surcharges were increased during the term without notice. It wasn't simply a matter of paying the agreed premium. I wanted to turn to the equitable cause. Can you clarify the last point you just made? The surcharges were increased during the term, but did it remain within the ostensible premium amount? They just took a bigger percentage of that? Or are you saying they actually increased it beyond the agreed upon amount? The latter. Okay. Yes. I wanted to speak to the equitable cause of action. Harris Trust and Landwehr v. Dupree from this court both found it is black-letter law that there is an equitable cause of action for disgorgement of the proceeds against a third party that knowingly participates in a prohibited transaction. I don't know. I literally don't understand the basis for Mr. Shelley's claim that there isn't one that is settled law. What we're really arguing about here is the remedy. And he says, well, their claim about disgorgement would imply that it's different from every other equitable remedy because there are no equitable monetary remedies that don't require tracing. Again, clearly not true. Cigna v. Samara recognized the remedy of surcharge against the trustee. It's a purely monetary type of recovery not requiring tracing because that was available historically in equity. And the very section of Harris Trust that recognizes this equitable, an equitable remedy in this circumstance, cites to the treatise sections that explain the two types of remedy it was talking about. One was restitution if the property can be found, and the other was disgorgement of the proceeds if the property cannot be found. Okay. You're in red. Okay. Thank you, Your Honors. Thank you. Depot Inc. v. Caring for Montanans Inc. submitted the last case this morning. Chida v. Motel, if I'm pronouncing that correctly, or both of them correctly.
judges: W. Fletcher, Bybee, Burns